# 24-3116(L)

**25-1208(CON)**

*To Be Argued By*:
MARGUERITE B. COLSON

# United States Court of Appeals

**FOR THE SECOND CIRCUIT**

**Docket Nos. 24-3116(L), 25-1208(CON)**

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

DARIUS A. PADUCH,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

JAY CLAYTON,
*United States Attorney for the Southern District of New York,*
*Attorney for the United States of America*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

MARGUERITE B. COLSON,
ELIZABETH A. ESPINOSA,
NI QIAN,
JUN XIANG,
JAMES LIGTENBERG,

*Assistant United States Attorneys,*
*Of Counsel*

## TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . 2

A. The Government's Case . . . . . . . . . . . . . . . . 2

B. The Defense Case . . . . . . . . . . . . . . . . . . . . 12

C. The Guilty Verdict and Sentence. . . . . . . . . 13

ARGUMENT:

POINT I—The District Court Properly Admitted Limited Evidence of Paduch's Other Sexual Assaults . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

A. Relevant Facts . . . . . . . . . . . . . . . . . . . . . 14

B. Applicable Law . . . . . . . . . . . . . . . . . . . . . 16

1. Standard of Review . . . . . . . . . . . . . . . 16

2. Rules 413, 404(b), and 403 . . . . . . . . . 17

C. Discussion . . . . . . . . . . . . . . . . . . . . . . . . 19

POINT II—Sufficient Evidence Supported the Jury's Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

A. Applicable Law . . . . . . . . . . . . . . . . . . . . . 29

1. Standard of Review . . . . . . . . . . . . . . . 29

2. 18 U.S.C. § 2422(a) . . . . . . . . . . . . . . . 31

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . 31

PAGE

POINT III—Section 2422 is Constitutional Under the Commerce Clause . . . . . . . . . . . . . . . . . . . . . . 35

A. Relevant Facts . . . . . . . . . . . . . . . . . . . . . 35

B. Applicable Law . . . . . . . . . . . . . . . . . . . . . 37

1. Standard of Review . . . . . . . . . . . . . . . 37

2. The Commerce Clause . . . . . . . . . . . . . 38

C. Discussion . . . . . . . . . . . . . . . . . . . . . . . . 39

POINT IV—Paduch's Life Sentence for His Repeated Sexual Abuse of Numerous Minors Does Not Violate the Eighth Amendment . . . . . . . . . . . . 44

A. Relevant Facts . . . . . . . . . . . . . . . . . . . . . 44

B. Applicable Law . . . . . . . . . . . . . . . . . . . . . 48

1. The Eighth Amendment and Proportionality . . . . . . . . . . . . . . . . . . 48

2. Standard of Review . . . . . . . . . . . . . . . 49

C. Discussion . . . . . . . . . . . . . . . . . . . . . . . . 49

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

PAGE

# TABLE OF AUTHORITIES

*Cases*:

*Abbate v. United States*,
359 U.S. 187 (1959). . . . . . . . . . . . . . . . . . . . . . . . . 53

*Blodgett v. Holden*,
275 U.S. 142 (1927). . . . . . . . . . . . . . . . . . . . . . . . . 37

*Brown v. United States*,
No. 19-2828, 2020 WL 1061074 (2d Cir. Feb. 12, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Cheek v. United States*,
498 U.S. 192 (1991). . . . . . . . . . . . . . . . . . . . . . . . . 37

*Ewing v. California*,
538 U.S. 11 (2003). . . . . . . . . . . . . . . . . . . . . . . . . 48

*Flemming v. Nestor*,
363 U.S. 603 (1960). . . . . . . . . . . . . . . . . . . . . . . . . 37

*Fletcher v. Peck*,
10 U.S. 87 (1810). . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Fullilove v. Klutznick*,
448 U.S. 448 (1980). . . . . . . . . . . . . . . . . . . . . . . . . 37

*Graham v. Florida*,
560 U.S. 48 (2010). . . . . . . . . . . . . . . . . . . 48, 49, 54

*Hutto v. Davis*,
454 U.S. 370 (1982). . . . . . . . . . . . . . . . . . . . . . . . . 48

*Jones v. United States*,
529 U.S. 848 (2000). . . . . . . . . . . . . . . . . . . . . 43, 44

PAGE

*Puckett v. United States*,
556 U.S. 129 (2009). . . . . . . . . . . . . . . . . . . . . . . . 31

*Rummel v. Estelle*,
445 U.S. 263 (1980). . . . . . . . . . . . . . . . . . . . . . . . 51

*Sanitation & Recycling Industry, Inc. v. City of New York*,
107 F.3d 985 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . 38

*United States v. Ahmed*,
119 F.4th 564 (8th Cir. 2024). . . . . . . . . . . . . . . . 23

*United States v. Allen*,
127 F.3d 260 (2d Cir. 1997) . . . . . . . . . . . . . . 29, 30

*United States v. Atilla*,
966 F.3d 118 (2d Cir. 2020) . . . . . . . . . . . . . . . . . 29

*United States v. Bastian*,
770 F.3d 212 (2d Cir. 2014) . . . . . . . . . . . . . . 39, 53

*United States v. Batton*,
602 F. 3d 1191 (10th Cir. 2010) . . . . . . . . . . . . . . 23

*United States v. Brock*,
789 F.3d 60 (2d Cir. 2015) . . . . . . . . . . . . . . . . . . 29

*United States v. Brooks*,
723 F. App'x 671 (11th Cir. 2018) . . . . . . . . . 23, 25

*United States v. Butler*,
39 F.4th 1349 (11th Cir. 2022). . . . . . . . . . . . . . . 54

*United States v. Carter*,
110 F. App'x 165 (2d Cir. 2004) . . . . . . . . . . . . . . 49

*United States v. Clay*,
148 F.4th 1181 (10th Cir. 2025). . . . . . . . . . . . . . 23

PAGE

*United States v. Courtright*,
632 F.3d 363 (7th Cir. 2011) . . . . . . . . . . . . . 23, 25

*United States v. Davis*,
624 F.3d 508 (2d Cir. 2010) . . . . . . . . . . . . . . 19, 27

*United States v. Dawkins*,
999 F.3d 767 (2d Cir. 2021) . . . . . . . . . . . . . . 30, 32

*United States v. Delano*,
55 F.3d 720 (2d Cir. 1995) . . . . . . . . . . . . . . . 30, 32

*United States v. Diaz*,
176 F.3d 52 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . 49

*United States v. Dupree*,
870 F.3d 62 (2d Cir. 2017) . . . . . . . . . . . . . . . . . . 18

*United States v. Dwinells*,
508 F.3d 63 (1st Cir. 2007) . . . . . . . . . . . . . . . . . . 51

*United States v. Enjady*,
134 F.3d 1427 (10th Cir. 1998) . . . . . . . . . . . . . . 18

*United States v. Finley*,
245 F.3d 199 (2d Cir. 2001) . . . . . . . . . . . . . . . . . 30

*United States v. Foley*,
740 F.3d 1079 (7th Cir. 2014) . . . . . . . . . . . . 22, 24

*United States v. Frady*,
456 U.S. 152 (1982) . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Frank*,
No. 04-20778, 2006 WL 8434880 (S.D. Fla. Nov.
16, 2006) . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 25

PAGE

*United States v. Frederick*,
No. 22-50256, 2024 WL 3886979 (9th Cir. Aug. 21, 2024) . . . . . 54

*United States v. Gahagen*,
44 F.4th 99 (2d Cir. 2022) . . . . . 29

*United States v. Gil*,
297 F.3d 93 (2d Cir. 2002) . . . . . 42

*United States v. Giordano*,
442 F.3d 30 (2d Cir. 2006) . . . . . 40, 41

*United States v. Gore*,
154 F.3d 34 (2d Cir. 1998) . . . . . 30

*United States v. Griffith*,
284 F.3d 338 (2d Cir. 2002) . . . . . 41

*United States v. Guang*,
511 F.3d 110 (2d. Cir. 2007). . . . . 18

*United States v. Guzman*,
591 F.3d 83 (2d Cir. 2010) . . . . . 40

*United States v. Hadden*,
No. 23-6822, 2024 WL 4456203 (2d Cir. Oct. 10, 2024) . . . . . 18, 21

*United States v. Hooper*,
No. 21-4220, 2022 WL 1184181 (4th Cir. Apr. 21, 2022) . . . . . 54

*United States v. Hornaday*,
392 F.3d 1306 (11th Cir. 2004) . . . . . 41

*United States v. Johnson*,
505 F.3d 120 (2d Cir. 2007) . . . . . 53

PAGE

*United States v. Josephberg*,
562 F.3d 478 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . 29

*United States v. Kelly*,
128 F.4th 387 (2d Cir. 2025) . . . . . . . . . . . . . . . . . 35

*United States v. King*,
276 F.3d 109 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . 37

*United States v. Kohlmeier*,
858 F. App'x 444 (2d Cir. 2021) . . . . . . . . . . . . . . . 55

*United States v. Larson*,
112 F.3d 600 (2d Cir. 1997) . . . . . . . . . . . . . . . 19, 27

*United States v. Le*,
902 F.3d 104 (2d Cir. 2018) . . . . . . . . . . . . . . . 37, 39

*United States v. Livoti*,
196 F.3d 322 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . 18

*United States v. Lopez*,
514 U.S. 549 (1995). . . . . . . . . . . . . . . . . . 38, 40, 43

*United States v. Marcus*,
560 U.S. 258 (2010). . . . . . . . . . . . . . . . . . . . . . 31, 52

*United States v. McGrain*,
105 F.4th 37 (2d Cir. 2024) . . . . . . . . . . . . . . . . . . 55

*United States v. McGriff*,
287 F. App'x 916 (2d Cir. 2008) . . . . . . . . . . . . . . . 42

*United States v. Minkowitz*,
104 F.3d 350, 1996 WL 547520 (2d Cir. Sept. 26, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Morrison*,
529 U.S. 598 (2000). . . . . . . . . . . . . . . . . . . . . . 38, 40

PAGE

*United States v. Nagel*,
559 F.3d 756 (7th Cir. 2009) . . . . . . . . . . . . . . . . 51

*United States v. Napout*,
963 F.3d 163 (2d Cir. 2020) . . . . . . . . . . . . . . 39, 53

*United States v. Nicholson*,
185 F. Supp. 2d 982 (E.D. Wis. 2002) . . . . . . . . . 42

*United States v. Oluwanisola*,
605 F.3d 124 (2d Cir. 2010) . . . . . . . . . . . . . . . . . 17

*United States v. Patton*,
451 F.3d 615 (10th Cir. 2006) . . . . . . . . . . . . . . . 42

*United States v. Paulino*,
445 F.3d 211 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 16

*United States v. Puglisi*,
458 F. App'x 31 (2d Cir. 2012) . . . . . . . . . . . . . . . 50

*United States v. Quinones*,
511 F.3d 289 (2d Cir. 2007) . . . . . . . . . . . . . . . . . 16

*United States v. Reingold*,
731 F.3d 204 (2d Cir. 2013) . . . . . . . . . . . . . . . . . 48

*United States v. Rivera*,
546 F.3d 245 (2d Cir. 2008) . . . . . . . . . . . . . . 49, 50

*United States v. Salerno*,
481 U.S. 739 (1987). . . . . . . . . . . . . . . . . . . . . 38, 41

*United States v. Samet*,
466 F.3d 251 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 16

*United States v. Santiago*,
238 F.3d 213 (2d Cir. 2001) . . . . . . . . . . . . . . . . . 37

PAGE

*United States v. Schaffer*,
851 F.3d 166 (2d Cir. 2017) . . . . . . . 18, 19, 21, 27

*United States v. Schaffer*,
No. 12 Cr. 430 (ARR), 2014 WL 1515799 (E.D.N.Y. Apr. 18, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Siddiqui*,
699 F.3d 690 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . 17

*United States v. Tykarsky*,
446 F.3d 458 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . 41

*United States v. Valdez*,
16 F.3d 1324 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . 16

*United States v. Vickers*,
708 F. App'x 732 (2d Cir. 2017) . . . . . . . . . . . 22, 54

*United States v. Villafuerte*,
502 F.3d 204 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . 30

*United States v. Waqar*,
997 F.3d 481 (2d Cir. 2021) . . . . . . . . . . . . . . . . . . 35

*United States v. Weintraub*,
273 F.3d 139 (2d Cir. 2001) . . . . . . . . . . . . . . . 39, 53

*United States v. Whab*,
355 F.3d 155 (2d Cir. 2004) . . . . . . . . . . . . . . . 39, 52

*United States v. Whited*,
311 F.3d 259 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . 42

*United States v. Worsham*,
479 F. App'x 200 (11th Cir. 2012) . . . . . . . . . . . . 54

*United States v. Yousef*,
327 F.3d 56 (2d Cir. 2003) . . . . . . . . . . . . . . . . 48, 50

PAGE

*Wachovia Bank v. Schmidt*,
546 U.S. 303 (2006). . . . . . . . . . . . . . . . . . . . . . . . 24

*Younger v. Harris*,
401 U.S. 37 (1971). . . . . . . . . . . . . . . . . . . . . . . . . 38

*Statutes, Rules & Other Authorities*:

18 U.S.C. § 844(i) . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

18 U.S.C. § 2251A. . . . . . . . . . . . . . . . . . . . . . . . . . 24

18 U.S.C. § 2422 . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 2423 . . . . . . . . . . . . . . . . . . . . . . . . . 21, 54

Fed. R. Crim. P. 12(b)(3) . . . . . . . . . . . . . . . . . . . . . 39

Fed. R. Crim. P. 29 . . . . . . . . . . . . . . . . . . . . . . . . . 30

Fed. R. Crim. P. 33 . . . . . . . . . . . . . . . . . . . . . . . 36, 39

Fed. R. Crim. P. 52(b). . . . . . . . . . . . . . . . . . . . . . 37, 39

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fed. R. Evid. 404(b) . . . . . . . . . . . . . . . . . . . . . . *passim*

Fed. R. Evid. 413 . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fed. R. Evid. 414 . . . . . . . . . . . . . . . . . . . . . . . . *passim*

New York Penal Law § 130.00(3) . . . . . . . . . . . . . . . 20

New York Penal Law § 130.55 . . . . . . . . . . . . . . 20, 53

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket Nos. 24-3116(L), 25-1208(CON)

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

DARIUS A. PADUCH,

*Defendant-Appellant.*

## BRIEF FOR THE UNITED STATES OF AMERICA

### Preliminary Statement

Darius Paduch appeals from a judgment of conviction entered on November 20, 2024, in the United States District Court for the Southern District of New York, following a ten-day jury trial before the Honorable Ronnie Abrams, United States District Judge.

Superseding Indictment S2 21 Cr. 181 (RA) (the "Indictment") was filed on January 16, 2024, in thirteen counts. Counts One through Seven each charged Paduch with inducement to travel to engage in unlawful sexual activity, in violation of 18 U.S.C. §§ 2422(a) and 2. Counts Eight through Thirteen each charged Paduch with inducement of a minor to engage in

unlawful sexual activity, in violation of 18 U.S.C. §§ 2422(b) and 2.

Trial commenced on April 25, 2024, and ended on May 8, 2024, when Paduch was convicted of Counts One, Two, Three, Four, Five, Seven, Eight, Nine, Ten, Twelve, and Thirteen. The Government did not proceed to trial on Counts Six and Eleven.

On November 20, 2024, the District Court sentenced Paduch to 240 months' imprisonment on Counts One through Five and Seven, to run concurrently with sentences of life imprisonment on the remaining counts.

Paduch is serving his sentence.

## Statement of Facts

### A. The Government's Case

The evidence at trial proved that, for years, Paduch sexually abused boys and young men entrusted to his medical care. The victims—some barely teenagers and some suffering pervasive cognitive delays—sought out Paduch to treat their most sensitive health issues. Paduch, in turn, capitalized on his urological expertise and prestigious professional affiliation, using patient after patient to gratify his own sexual desires.

The trial evidence included the testimony of eleven victims who were sexually abused by Paduch during purported medical examinations, seven of whom were statutory victims referenced in the Indictment; the testimony of two victims' mothers; the testimony of a technician who witnessed Paduch sexually assault a

patient during a penile ultrasound; the testimony of a hospital administrator who recalled Paduch directing patients to produce semen samples in an examination room rather than in a private collection room; the testimony of two practicing urologists regarding the doctor-patient relationship and the standard of care for urology, including pediatric urology; and testimony from a practicing psychologist regarding sexual abuse in the doctor-patient setting.

The Government also introduced sexually explicit text messages from Paduch to his victims; medical records of the testifying victims; and two pornographic images from Paduch's iCloud account, one capturing a naked young man standing behind a medical screen and seemingly unaware that he was being photographed. (GX 608, 608M).[1] The other photograph captured several young men, nude and assembled in line behind a nude male, bent at the waist as a doctor examines his rectal area. (GX 609, 609M). Finally, the Government introduced evidence from the internet search history on Paduch's laptop, which included a

---

[1] "GX" refers to a Government exhibit at trial; "Br." refers to Paduch's brief on appeal; "A." refers to the appendix filed with that brief; "PSR" refers to the Presentence Report prepared by the Probation Office in connection with Paduch's sentencing; and "Dkt." refers to an entry on the District Court's docket for this case. Unless otherwise noted, case citations omit all internal quotation marks, citations, alterations, and footnotes.

website entitled "Doctor fucking teen—XVIDEOS.COM." (GX 610).

Paduch's abuse and assault included masturbating his young patients—at times with ungloved hands—while their parents waited just outside the examination room. (*See, e.g.*, A. 491, 857, 1025-26, 1115, 1231-32, 1275-76, 1354, 1454-55). He digitally prodded and penetrated certain victims' rectums. (A. 487, 857, 1413). He induced victims to ejaculate in his presence or, in some cases, directly on him. (A. 491, 859, 1029, 1111, 1115-16, 1413). He smeared a young patient's ejaculate on the patient's mouth. (A. 490-91). He exposed his own genitals to another patient (A. 1287) and rubbed his erect penis against yet another (A. 1508). Expert medical testimony about the standard of care, best practices, and physicians' professional obligations established that Paduch's conduct lacked any valid medical purpose. (*See, e.g.*, A. 671, 689, 693, 703).

To abuse patients undetected, Paduch exploited his patients' trust and the power differential inherent in the doctor-patient relationship. (A. 934-35). He leveraged his in-demand status as a specialist in Klinefelter Syndrome, a genetic condition affecting several of his victims. (A. 798). He leveraged his affiliation with Weill Cornell-New York Presbyterian, a world-class hospital in New York City. (A. 569, 804). Paduch desensitized victims to the sexualization of their doctor-patient relationships by engaging them in explicit conversations about their sexual activity and the appearance of their genitalia, and by volunteering intimate information about his own sexual history. (*See, e.g.*,

A. 527, 863, 1453, 1458). Paduch went so far as to lie about his sexual orientation to disabuse patients of the notion that he might be sexually interested in them. (A. 900).

The evidence also demonstrated that Paduch created opportunities to be alone with victims to facilitate his abuse. He invited teenage patients to intern for him, and even to live with him during a prospective internship (A. 525, 819-20). He manufactured sexual dysfunction issues for his patients, insisting that the supposed issues required routine follow-ups and bespoke regimens that involved either Paduch watching patients masturbate or masturbating them himself. (*E.g.*, A. 1110-11, 1452-54; GX 401, 405, 410). He purported to administer medical care outside the hospital setting, including on his boat in New Jersey, where he masturbated a victim and exposed himself. (A. 1284-87; GX 410). Cloaked as clinical care, Paduch's abuse was difficult for his victims to detect, much less deter or disclose. (A. 934, 941, 943-44). That was particularly true for Paduch's young victims who suffered cognitive and expressive delays associated with Klinefelter Syndrome.

At trial, the Government proved that Paduch induced Sam Lenox,[2] Luke Bevin, Evan Stewart, Matt Cirillo, Connor Gannick, and James Brent to travel interstate so that he could sexually abuse and assault them. The Government also proved that Paduch used

---

[2] By agreement of the parties and with permission of the District Court, victims were permitted to testify under pseudonyms. (A. 98; Dkt. 115).

interstate communications to sexually abuse and assault Sam, Luke, Evan, Matt, and Connor—as well as Matthew Colon—when they were minors.

*Sam Lenox*. Sam was Paduch's patient for two years, beginning in 2015 when Sam was 16 years old. (GX 201). Sam was a high-school student desperate for help with erectile issues when he was referred to Paduch. (A. 482-83). Alone with Sam in an examination room, Paduch would masturbate Sam under the guise of treating the boy's sexual dysfunction. (A. 490-92; GX 401). During one appointment, when Sam suggested that he could self-stimulate, and even insisted that he would be more comfortable doing so, Paduch placed his hand on Sam's stomach, told him to relax, and proceeded to masturbate Sam to ejaculation, some of which landed on Paduch's shirt. Paduch then smeared that ejaculate on Sam's mouth, incredulously remarking, "Don't tell me you've never tasted it." (A. 491-92). Paduch began texting Sam the night of his first appointment. (GX 1001). Later, Paduch asked for a live video of Sam "J[acking] O[ff]." (GX 401). He asked whether Sam had bought the Fleshlight vagina —a sex toy—he recommended. (*Id.*). He mused about playing with Sam's penis and ejaculating into Thanksgiving turkeys. (*Id.*). He admitted to "helping" Sam obtain a semi-erection in Paduch's office. (*Id.*).

Paduch also hired Sam as a high-school intern. Once, during that internship, when Sam mentioned that he was continuing to have erectile issues, Paduch hurried Sam into an empty examination room, directed him to drop his pants, and started masturbating Sam. (A. 491).

Sam's mother or father drove Sam from their home in New Jersey to most appointments with Paduch in Manhattan; the sole purpose of their trips was to attend follow-up visits with Paduch at Paduch's direction. (A. 486, 541; GX 401).

*Luke Bevin*. Luke was in seventh grade when he was diagnosed with Klinefelter Syndrome (A. 794). His condition manifested in significant cognitive and expressive delays. (A. 794, 842; GX 205). Prompted by her son's diagnosis, Luke's mother, Krista, attended a medical conference in Baltimore where she met Paduch. (A. 796). Paduch told Krista that he treated patients from all over the country and that he had a waiting list of prospective patients. (A. 798). When Paduch agreed to treat her son, Krista "felt relieved and hopeful." (A. 800).

At Luke's first appointment in 2015, when the boy was just 14 years old, Paduch provided Luke with his cellphone number, encouraging Luke to text him about anything. (A. 809). At regular follow-up appointments, Paduch sexually abused Luke. (A. 857). At most appointments, he would masturbate Luke, causing Luke to ejaculate in Paduch's hands or on Paduch's clothes. (A. 859). Waiting just outside the examination room, Luke's mother believed that on the occasions where her son was required to produce a semen sample, he would be afforded privacy and directed to drop his specimen through a small window or slot. (A. 818).[3]

---

[3] At trial, the Government offered witness testimony that Weill Cornell had a special-procedure room specifically designed for patients to produce semen

For years, Luke's mother and father took Luke to every visit with Paduch, either driving or flying from the Bevins' home in Maryland for the sole purpose of seeking follow-up treatment from Paduch. (A. 816).

*Evan Stewart*. Evan was 15 years old when he was diagnosed with Klinefelter Syndrome. Like Luke, Evan suffered from significant cognitive and expressive impairments. (A. 1003). Seeking "to get the best" for their son, Evan's parents entrusted him to Paduch's care in 2009. (A. 1005). Paduch sexually abused Evan for years, beginning at the very first appointment, where Paduch undid Evan's gown, played pornography, and began masturbating the teenage boy. (A. 1022). Paduch went on to masturbate Evan during "pretty much every visit." (A. 1029).

Paduch also sent Evan sexually charged text messages, including to ask whether Evan had purchased the Fleshlight vagina Paduch recommended, which he claimed to have purchased for fictitious "nephews" and "sons." (GX 407). Paduch also directed Evan to practice masturbating at home, encouraging Evan to "stroke it slowly," just as Paduch claimed to be doing at that moment, while working from home. (GX 407).

Evan traveled with his parents from their home in New Jersey to attend multiple follow-up appointments with Paduch. (A. 1027).

---

samples in private. Without interacting with those patients, medical staff would retrieve their samples through a window slot in the collection room. (A. 894-96).

*Matthew "Matt" Cirillo*. Paduch became Matt's urologist in 2007, when Matt was 16 years old and had been diagnosed with Klinefelter Syndrome. A few years later, after Paduch performed a sperm extraction surgery to preserve Matt's fertility, appointments took a "weird sexual turn." (A. 1452). During physical exams, Paduch would encourage Matt to touch himself "down there." (A. 1452). He would watch Matt masturbate, telling him to focus on the porn Paduch was playing. (A. 1455). Rather than provide Matt with privacy to self-stimulate, Paduch would instead pull the privacy curtain around them both. (A. 1457). In addition to watching Matt masturbate, Paduch masturbated Matt with bare hands. (A. 1455). The first time this occurred, Matt was reclining on the examination table and self-stimulating at Paduch's direction. Meanwhile, Paduch was leaning over Matt, his hip touching Matt's body. When Matt grew tired of masturbating, Paduch "took over," insisting he was going to "get it done." (A. 1455). After Matt ejaculated into a cup, Paduch asked whether Matt had ever smelled his own ejaculate. When Matt said that he had not, Paduch brought the cup to Matt's nose, inviting Matt to "take a whiff." (A. 1456).

Matt was under Paduch's care for years, attending follow-up visits every six months at Paduch's direction. Matt traveled to New York City from his home in New Jersey solely for the purpose of attending those visits. (A. 1450-51).

*Connor Gannick*. Connor became Paduch's patient in 2010. Conor was 13 years old at the time and had been diagnosed with Klinefelter Syndrome. (A. 1215;

GX 214). During his second visit to Paduch, when Connor was still 13, his mother left Connor alone in the exam room with the doctor. (A. 1225). Paduch displayed pornography for Connor and then masturbated him twice. (A. 1227). He claimed Connor was "doing it wrong," even though Connor had no issue masturbating and ejaculating on his own. (A. 1227). In nearly every follow-up appointment for the next several years, Connor felt compelled to request privacy after Paduch directed him to masturbate in his presence. (A. 1230). During one appointment, Paduch caught Connor by surprise when he entered the examination room unannounced as Connor was self-stimulating. Paduch proceeded to stimulate Connor's penis with a vibrator, a bulge visible beneath his pants. (A. 1231-32).

Connor traveled with his mom from their home in New Jersey to New York City to attend his first appointment with Paduch and for regular follow-up appointments thereafter. (A. 1218).

*James Brent*. James became Paduch's patient in 2012, when he was 20 years old. (A. 1267; GX 207). At the time, James was suffering sexual side effects from a hair-loss drug. (A. 1265). At the very first appointment, Paduch played pornography and sexually abused James. He spent nearly an hour attempting to make James ejaculate, using his own hands, a Fleshlight, a vibrator, and lubricant. (A. 1269-72). Paduch also gave James his cellphone number. (A. 1277). When James experienced some bruising that night, he reached out. (*Id.*). In the course of their conversation, Paduch offered James a job doing data entry for a

purported "research study" and cleaning Paduch's boat. (A. 1278).

Paduch then developed a purported program to treat James's sexual dysfunction. (A. 1273, 1275-76). As part of that "program," James would travel from his home in New Jersey to appointments at Weill Cornell, during which Paduch manually masturbated James—with his hands and a vibrator. (A. 1275-76). After James came under his care, Paduch told James that it was best to continue treatment on Paduch's boat in New Jersey, where Paduch would have more time to "help" with "stimulation." (GX 410). Paduch assured James that his boat was a "safe space . . . to practice without dealing with . . . appointment times." (A. 1285).

On the boat, Paduch "treated" James by masturbating him. (A. 1286-87). He administered sedatives and bragged about doing the same to other patients. (A. 1293; GX 410). On one occasion, when Paduch was masturbating James, he brought his mouth so close to James's penis that James feared he might kiss it. Paduch told James, "I'll do whatever you need me to do," leaving James with the impression that Paduch was offering oral sex. (A. 1320). While on his boat, Paduch also exposed his genitals to James. (A. 1287).

James endured Paduch's "unorthodox" methods because he was "so desperate to get better" that he "would do anything." (A. 1282, 1343). Paduch led James to believe that "everything [they] were doing was under medical necessity" and that Paduch derived no pleasure from his activities with James, because he was heterosexual. (A. 1282). When James eventually

came to learn that Paduch was not heterosexual, James felt "lied to and extremely violated." (A. 1321).[4]

*Matthew Colon*. Matthew had just turned 13 when he visited Paduch in 2007 for a hereditary hormone issue. (A. 1348; GX 213). During appointments—after asking Matthew's father to leave the examination room—Paduch displayed pornography for the boy and instructed Matthew to masturbate in his presence. (A. 1352). Paduch also masturbated Matthew himself, insisting that Matthew was masturbating incorrectly and that he would show the boy a more pleasurable method. (A. 1352-54)

In addition to testimony from seven statutory victims, four of Paduch's other patients testified about being assaulted during medical visits. As with the statutory victims, Paduch sexually abused and assaulted these victims by masturbating them under the guise of medical care. (A. 1063-88, 1091-1125, 1405-16, 1499-1521).

### B. The Defense Case

Paduch called four witnesses, including two character witnesses (A. 1553-59, 1590-98) and a psychologist who testified regarding memory (A. 1655-80). Through cross-examination and argument, Paduch challenged the integrity of the Government's investigation, as well as the credibility of the victims, insisting that their memories were unreliable and

---

[4] Paduch's longtime medical secretary testified that Paduch deliberately deceived patients about his sexuality. (A. 900).

improperly influenced by the possibility of financial reward in pending civil lawsuits. (*E.g.*, A. 453-54, 456, 461-62, 1867-71).

### C. The Guilty Verdict and Sentence

On May 8, 2024, the jury convicted Paduch of all eleven counts on which the Government proceeded to trial. (Dkt. 131).

On November 20, 2024, Judge Abrams sentenced Paduch to 240 months' imprisonment on Counts One through Five and Seven, to run concurrently with terms of life imprisonment on Counts Eight, Nine, Ten, Twelve, and Thirteen.

## ARGUMENT

## POINT I

### The District Court Properly Admitted Limited Evidence of Paduch's Other Sexual Assaults

Paduch argues that testimony about his abuse of additional patients was inadmissible under Rules 413, 414, and 404(b) of the Federal Rules of Evidence. (Br. 14-20). He further argues that such evidence was "cumulative, irrelevant, and unduly prejudicial," and therefore should have been excluded under Rule 403. (Br. 15). Paduch's challenge is meritless. The plain text of Rules 413 and 414 allowed the jury to consider evidence of Paduch's other sexual assaults; Rule 404(b) provided an additional basis to admit the challenged evidence; and the evidence did not run afoul of Rule 403. In any case, the admission of such evidence

was harmless given the other, overwhelming evidence of Paduch's guilt.

### A. Relevant Facts

Prior to trial, the Government sought to introduce the testimony of seven additional patients who Paduch had manually masturbated. (Dkt. 74, 76, 104; A. 209-10).[5] The Government also sought to introduce testimony from two of Paduch's former co-workers, one an ultrasound technician who witnessed Paduch manually masturbate a patient, and the other a human resources professional who questioned Paduch about the incident. (Dkt. 89). During questioning by the HR professional, Paduch adamantly denied that he had masturbated a patient. (*Id.*). And when asked about a separate complaint, Paduch denied understanding the term "whack off" (*id.*), despite having sent sexually explicit messages to victims that included similarly crude phrases (GX 401). The Government moved to admit this collective testimony under Federal Rules of Evidence 413 and 414. (Dkt. 74, 76, 89; A. 209-211). Alternatively, the Government argued that such evidence was admissible for several non-propensity purposes under Federal Rule of Evidence 404(b). (*Id.*). The defense opposed both grounds for admission, arguing that Rules 413, 414, and 404(b) did not permit

[5] The Government's initial motion *in limine* catalogued the accounts of seventeen Rule 413 and 414 victims whose testimony the Government potentially sought to admit. (Dkt. 74).

testimony from these witnesses. (Dkt. 73 at 6-10; Dkt. 79 at 2-6).

Ultimately, Judge Abrams permitted the Government to introduce the testimony of four of the non-statutory victims, to be chosen by the Government. (Dkt, 110). She also permitted the testimony of Paduch's former co-workers. (*Id.*). In an oral opinion accompanying her ruling, Judge Abrams rejected Paduch's argument that Federal Rules of Evidence 413 and 414 applied only in cases where a defendant had been charged with sexual assault or child molestation. (A. 213). Citing case law from this Circuit and the Seventh Circuit, Judge Abrams concluded that Rules 413 and 414 require a conduct-focused inquiry rather than a charge-focused one. (A. 213). Judge Abrams further ruled that the challenged testimony was separately admissible under Rule 404(b) to demonstrate, among other things, Paduch's criminal intent, his opportunity to commit the charged crime, the absence of mistake, and his consciousness of guilt. (A. 217-19). Finally, Judge Abrams conducted a multi-factor analysis under Rule 403, finding that the limited evidence of other sexual assaults was highly probative and not unduly cumulative, inflammatory, or otherwise prejudicial. (A. 221-24).

At trial, the Government offered the testimony of non-statutory victims Nate Klavin, Tucker Coburn, Toran Chambers, and Tim Douglas. All testified that Paduch had manually masturbated them—in Toran's case, when he was only 12 years old. (A. 1066, 1075-78 (Toran Chambers); 1113-15 (Tim Douglas); 1411-13 (Nate Klavin); 1506-09 (Tucker Coburn)). As to Tim,

the Government also introduced explicit text messages from Paduch inquiring whether Tim was relaxed when "spanking" and claiming that Paduch would need "safety goggles" for future "practice" sessions. (GX 405). The Government further introduced the testimony of an ultrasound technician who witnessed Paduch manually stimulate a patient during an ultrasound (A. 1478), as well as the HR professional to whom Paduch denied such conduct and claimed ignorance of the term "whack off" (A. 1485).

## B. Applicable Law

### 1. Standard of Review

This Court has long held that "[a] district court judge is in the best position to evaluate the admissibility of offered evidence." *United States v. Valdez*, 16 F.3d 1324, 1332 (2d Cir. 1994). While a district court's legal interpretation of the Federal Rules of Evidence is reviewed *de novo*, *see United States v. Samet*, 466 F.3d 251, 254 (2d Cir. 2006), this Court accords "great deference" to a district court in ruling "as to the relevancy and unfair prejudice of proffered evidence, mindful that it sees the witnesses, the parties, the jurors, and the attorneys, and is thus in a superior position to evaluate the likely impact of the evidence." *United States v. Paulino*, 445 F.3d 211, 217 (2d Cir. 2006). Consistent with this deferential review, this Court "will reverse only for abuse of discretion," which requires a finding that the challenged ruling was "arbitrary and irrational." *United States v. Quinones*, 511 F.3d 289, 307-08 (2d Cir. 2007).

Even when a district court's evidentiary ruling is "manifestly erroneous," the defendant is not entitled to a new trial if the error was harmless. *United States v. Siddiqui*, 699 F.3d 690, 702 (2d Cir. 2012). "Under harmless error review, [this Court] ask[s] whether [it] can conclude with fair assurance that the errors did not substantially influence the jury." *United States v. Oluwanisola*, 605 F.3d 124, 133-34 (2d Cir. 2010).

### 2. Rules 413, 404(b), and 403

Under Rule 413, in a criminal case where the defendant is accused of a sexual assault, "evidence that the defendant committed any other sexual assault" is admissible and "may be considered on any matter to which it is relevant." Fed. R. Evid. 413(a). As relevant here, subsection (d) of Rule 413 defines "sexual assault" as "a crime under federal law or under state law . . . involving . . . contact, without consent, between any part of the defendant's body—or an object—and another person's genitals or anus." Fed. R. Evid. 413(d)(2).

Similarly, Rule 414 provides, "In a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other child molestation. The evidence may be considered on any matter to which it is relevant." Fed. R. Evid. 414(a). The rule defines "child" as a person below the age of 14 and "child molestation" as, among other conduct, "contact between any part of the defendant's body—or an object—and a child's genitals or anus." Fed. R. Evid. 414(d)(1), 414(d)(2)(C).

In essence, Rules 413 and 414 permit the Government to "use evidence of prior sexual assaults to show that a defendant has a pattern or propensity for committing sexual assault." *United States v. Schaffer*, 851 F.3d 166, 178 (2d Cir. 2017). The rules reflect the basic premise that "evidence of other sexual assaults is highly relevant to prove propensity to commit like crimes." *United States v. Enjady*, 134 F.3d 1427, 1431 (10th Cir. 1998) (citing the congressional record); *see also United States v. Hadden*, No. 23-6822, 2024 WL 4456203, at *2 (2d Cir. Oct. 10, 2024).

Rule 404(b) allows evidence of uncharged crimes, wrongs, or other acts for any relevant non-propensity purpose, such as to show motive, opportunity, intent, or knowledge. Under this Court's "inclusionary approach, prior act evidence is admissible if offered for any purpose other than to show a defendant's criminal propensity." *United States v. Dupree*, 870 F.3d 62, 76 (2d Cir. 2017). Specifically, such evidence is admissible, provided it: (1) is advanced for a proper purpose; (2) is relevant to the crimes for which the defendant is on trial; and (3) has probative value that is not substantially outweighed by any unfair prejudicial effect. *See, e.g.*, *United States v. Guang*, 511 F.3d 110, 121 (2d. Cir. 2007).

Any evidence offered at trial must also satisfy Rule 403, which provides that the "probative value" must outweigh "the danger of unfair prejudice," among other things. Fed. R. Evid. 403. Evidence is not unduly prejudicial when it is not "more inflammatory than the charged crime[s]." *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999). In enacting Rules 413 and 414,

Congress "expected that convictions within its ambit would normally be admitted and that their prejudicial value would normally not be outweighed by the risk of prejudice." *United States v. Davis*, 624 F.3d 508, 512 (2d Cir. 2010) (citing *United States v. Larson*, 112 F.3d 600, 604-05 (2d Cir. 1997)); *see also Schaffer*, 851 F.3d at 178.

## C. Discussion

Paduch cannot show that the District Court erred in admitting the testimony of four non-statutory victims, as well as two co-workers, under Rules 413 and 414. Those rules create a presumption that evidence of prior sexual assaults is relevant and probative in prosecutions, like this one, that involved charges of sexual assault. *See Schaffer*, 851 F.3d at 180 ("[T]he practical effect of Rule 413 is to create a presumption that evidence of prior sexual assaults is relevant and probative in a prosecution for sexual assault.").

Paduch claims that the District Court erred in admitting such testimony because neither of the statutory provisions he was charged with violating—18 U.S.C. § 2422(a) and § 2422(b)—is a "sexual assault" or "child molestation" within the meaning of the Rules. According to Paduch, the gravamen of the charged offenses is the inducement or use of an instrumentality of interstate commerce, rather than the resultant sexual acts. (Br. 16).

Paduch misreads the plain text of Rule 413.[6] The Rule does not require a defendant to have been "charged" with sexual assault. It requires only that the defendant be "accused of a sexual assault," a term defined to include a crime "involving" any non-consensual contact between the defendant's body and another person's genital or anus. As alleged against Paduch, 18 U.S.C. §§ 2422(a) and 2422(b) are charges of "sexual assault." The counts tried to the jury were predicated on violations of New York Penal Law § 130.55, which makes it a crime to "subject[ ] another person to sexual contact without the latter's consent." The term "sexual contact" is further defined at New York Penal Law § 130.00(3) to include "any touching of the sexual or other intimate parts of a person for the purpose of gratifying sexual desire of either party." Thus, insofar as the § 2422(a) and § 2422(b) charges here are predicated on New York Penal Law § 130.55, they are federal crimes that *involve* "contact, without consent, between any part of the defendant's body—or an object—and another person's genitals or anus." Fed. R. Evid. 413(a); *see* Merriam Webster Dictionary, *available at* https://www.merriam-webster.com/dictionary/involve (defining "involve" to mean, among other things "to have within or as part of itself" or "to relate closely").

Consistent with a plain-text reading of Rule 413 and the rulings of other circuits, this Court has affirmed the admission of sexual assault evidence under

---

[6] Given the textual similarity between Rules 413 and Rule 414, the parties agree that the same analysis pertains. (Br. 17)

Rule 413 against defendants charged with violations of §§ 2422(a) and (b). In *United States v. Hadden*, for example, the defendant was tried on four counts of inducing female patients to travel interstate so that he could sexually abuse them at medical appointments. 2024 WL 4456203, at *1-6. This Court upheld the admission of "limited testimony from five uncharged-act victims and two nurses who witnessed Hadden engaging in a broad range of sexually inappropriate conduct during numerous medical examinations of patients." *Id.* at *2.

Likewise, in *United States v. Schaffer*, the defendant was charged with coercion and attempted coercion under §§ 2422(a) and (b). No. 12 Cr. 430 (ARR), 2014 WL 1515799 (E.D.N.Y. Apr. 18, 2014), *aff'd*, 851 F.3d 166 (2d Cir. 2017). At trial, the district court admitted portions of four videos that showed the defendant committing prior, uncharged sexual assaults on two minors. Prior to admitting the videos, the district court had ruled "that offenses under 18 U.S.C. § 2422 involving the enticement of a minor to engage in illegal sexual activity . . . fall within the realm of crimes involving nonconsensual sexual contact defined as 'sexual assault' under the rule." *Id.* at *10. On appeal, the defendant did not challenge that ruling, instead arguing that Rule 413 violated the Due Process Clause and that admission of the videos was unduly prejudicial under Rule 403. *Schaffer*, 851 F.3d at 169. Rejecting both claims, this Court upheld the admission of the videos under Rule 413. *Id.* at 184.

This Court has also endorsed the application of Rule 413 to 18 U.S.C. § 2423, which prohibits the

actual or attempted interstate transport of minors for an illegal sex act. *United States v. Vickers*, 708 F. App'x 732, 737 (2d Cir. 2017) ("As to the testimony concerning Vickers's sexual abuse of other victims, we conclude that such evidence was plainly admissible under Rules 413 and 414 because it was probative of Vickers's propensity for sexually abusing adolescent boys who were entrusted to his care.").[7]

In addition to the relevant case law from this Circuit, Paduch altogether ignores consistent case law among other circuits holding that the term "accused" in Rule 413 is not synonymous with "charged." As these courts have held, what matters is whether the defendant's alleged *conduct* involved sexual assault, not whether 18 U.S.C. § 2422 is categorically a "sexual assault" crime. In other words, the inquiry is conduct-based, rather than an application of a "categorical approach." *United States v. Foley*, 740 F.3d 1079, 1087 (7th Cir. 2014) ("The focus of the Federal Rules of Evidence is on facts, and the policy rationale for Rule 413 is that a person who has engaged in the covered conduct is likely to engage in it again. Rule 413 uses statutory definitions to designate the covered conduct, but

---

[7] While the appellants in *Hadden, Schaffer*, and *Vickers* do not appear to have contested the statutory applicability of Rule 413, the cases remain relevant. It is difficult to reconcile the affirmances in those cases with Paduch's view that, *on its face*, Rule 413 does not apply to 18 U.S.C. § 2422. And Paduch has not cited a single case holding that an offense charged under § 2422 is *not* a "sexual assault" under Rule 413.

the focus is on the conduct itself rather than how the charges have been drafted."); *see also United States v. Clay*, 148 F.4th 1181, 1197 (10th Cir. 2025) ("Rule 413 applies when the conduct underlying the charges in the case 'involves' 'sexual assault'—i.e., the five types of conduct set out in Rule 413(d)(1)-(5). Rule 413 does not require [the defendant's] desired categorical approach."); *United States v. Batton*, 602 F. 3d 1191, 1195-98 (10th Cir. 2010) (rejecting categorical approach under Rule 413 and upholding admission of other-act evidence against defendant charged with violation of § 2423); *United States v. Ahmed*, 119 F.4th 564, 568-69 (8th Cir. 2024) (rejecting categorical approach to Rule 413 in favor of conduct-specific inquiry); *United States v. Brooks*, 723 F. App'x 671, 681 (11th Cir. 2018) (agreeing with *Foley* in context of Rule 414). Here, Paduch was alleged—and found—to have *in fact* engaged in sexual assault.

Rather than address the litany of cases rejecting his categorical argument, Paduch relies instead on two out-of-circuit—and seemingly superseded—cases involving different criminal charges. (Br. 16-17) (citing *United States v. Courtright*, 632 F.3d 363, 368 (7th Cir. 2011) and *United States v. Frank*, No. 04-20778, 2006 WL 8434880, at *5 (S.D. Fla. Nov. 16, 2006)). In *Courtright*, the Seventh Circuit held that Rule 413 evidence was not admissible against a defendant charged with bank fraud and child pornography-related offenses, reasoning that the term "accused" was synonymous with "charged" and that the Rule 413(a) inquiry was a categorical one. 632 F.3d at 368-69. But *Courtright* cannot be squared with the Seventh's Circuit more recent, precedential opinion in *Foley*, which

held that Rule 413 requires a conduct-specific inquiry. 740 F.3d at 1087.[8]

In Paduch's other case, *Frank*, the district court held that Rule 413 evidence was not admissible against a defendant charged under 18 U.S.C. §§ 2251A, 2423(b), and 2423(c). 2006 WL 8434880, at *5. But *Frank* contradicts the Eleventh Circuit's later decision in *Brooks*, which agreed with the Seventh

[8] In any event, the Seventh Circuit's analysis in *Foley* was correct and its analysis in *Courtright* was wrong. Among other things, *Courtright*'s interpretation would create a conflict between Rule 413 and Rule 412. Rule 412(b)(1)(B) permits the admission of "evidence of specific instances of a victim's sexual behavior with respect to the person *accused* of the sexual misconduct" under certain circumstances. In the Advisory Committee Notes, the Committee explains that: "The reference to a person 'accused' is also used in a non-technical sense. There is no requirement that there be a criminal charge pending against the person or even that the misconduct would constitute a criminal offense." Fed. R. Evid. 413 Notes of Advisory Committee on Rules – 1994 Amendment. Rule 413, which is part of the same body of law as Rule 412, and which stems from similar policy considerations, should be read *in pari materia* with Rule 412. *Wachovia Bank v. Schmidt*, 546 U.S. 303, 315-16 (2006) ("[U]nder the *in pari materia* canon of statutory construction, statutes addressing the same subject matter generally should be read as if they were one law.").

Circuit's reading of Rule 413 in *Foley*. *See Brooks*, 723 F. App'x at 681.[9]

Because Judge Abrams properly applied Rule 413 to admit evidence of other sexual assaults, this Court need not address whether such evidence was separately admissible under Rule 404(b). But as Judge Abrams correctly concluded, Rule 404(b) provided an additional basis to admit the challenged evidence. (A. 217-19). Specifically, the testimony of four non-statutory victims was relevant to show that Paduch's abuse was not a mistake but instead systematic and planned, reflective of his criminal intent. *See, e.g.*, *United States v. Minkowitz,* 104 F.3d 350, 1996 WL 547520, at *1 (2d Cir. Sept. 26, 1996) (district court's finding that "evidence was probative on the issues of intent, identity, knowledge, absence of mistake or accident, and proof of plan" was "entirely consistent with other cases admitting evidence in analogous situations"). Consistent with Rule 404(b), such evidence was also relevant to show Paduch's opportunity to

---

[9] Moreover, even *Courtright* and *Frank* acknowledged that part of the Rule 413 evidence at issue could have been offered instead under Rule 404(b). *See Courtright*, 632 F.3d at 370 (suggesting that the requirements of Rule 404(b) had likely been met but that the Government waived the argument); *Frank*, 2006 WL 8434880, at *5 ("Minor E's proffered testimony that Mr. Frank had sex with her in 2002, knowing that she was 14 years old, and with other minors, all in exchange for money, and that he asked to take pictures, is nevertheless likely admissible under Rule 404(b).").

commit the charged crimes—namely, by "creating occasions to be alone with victims during exams and outside the clinical settings." (A. 217).[10] As to Paduch's two coworkers, Judge Abrams correctly determined that their testimony covering Paduch's purported denial of assault, as well as his professed ignorance regarding certain sexual terminology, reflected consciousness of guilt. (A. 218).

Furthermore, the admission of additional sexual assault testimony from non-statutory witnesses did not run afoul of Rule 403. Paduch insists that the evidence should have been excluded as irrelevant and unfairly prejudicial under Rule 403. (Br. 18-20). But Rule 413 recognizes the inherent relevance of such

---

[10] Paduch takes issues with Judge Abrams's statement that the non-statutory witnesses' testimony was relevant to proving Paduch's knowledge of victims' interstate travel. (Br. 18). That statement was correct. When Judge Abrams cited that rationale, it was not yet known which four of the non-statutory witnesses the Government would elect to call. Several of the 17 witness candidates featured in the Government's initial motion *in limine*, had, in fact, traveled interstate. (Dkt. 74 at 26 (cataloging non-statutory witnesses whose testimony would help "prove that the defendant was aware that certain Statutory Victims were under eighteen and/or traveled from states outside New York to visit him.")). By the time Judge Abrams ruled, at least two of the Rule 413 witnesses remaining on the Government's list (Victim-20 and Victim-25) were alleged to have traveled interstate. (Dkt. 104).

propensity evidence, and this case is no exception. As this Court stated in *Schaffer*, the "practical effect of Rule 413 is to create a presumption that evidence of prior sexual assaults is relevant and probative in a prosecution for sexual assault." 851 F.3d at 180; *see also United States v. Davis*, 624 F. 3d 508, 512 (2d Cir. 2010) ("[L]egislative sponsors of Rule 414 expected that convictions within its ambit would normally be admitted and that their [probative] value would normally not be outweighed by the risk of prejudice."); *United States v. Larson*, 112 F.3d 600, 604-05 (2d Cir. 1997) (citing legislative history and affirming district court's admission of evidence of defendant's sexual assault of other victims).

This is not the rare case where the unfair prejudice of other sexual-acts evidence outweighed its probative value. Paduch's own argument that the evidence was cumulative cuts against any claim of prejudice. (Br. 19). The Rule 413 evidence was "lurid" (Br. 14), but no more so than Paduch's horrifying conduct at the core of the charges, and the assaults were very similar. *See Schaffer*, 851 F.3d at 183 (agreeing with the district court that the Rule 413 evidence—videos of non-consensual sexual acts with two minor girls—"was no more inflammatory than the conduct alleged in the indictment"). Paduch manually masturbated the uncharged victims similarly to how he masturbated the statutory victims. (A. 1075-78 (Toran Chambers); 1113-15 (Tim Douglas); 1411-13 (Nate Klavin); 1506-09 (Tucker Coburn)). The conditions and issues that brought the non-statutory victims to Paduch were also similar to the conditions and issues of the statutory victims. (A. 1065-66 (Klinefelter Syndrome); 1094

(Klinefelter Syndrome); 1408 (erectile dysfunction) 1501-02 (Klinefelter Syndrome)). More fundamentally, none of Paduch's conduct towards the uncharged victims was more egregious than what he had done to the statutory victims: smearing ejaculate on Sam Lenox's face (A. 490-91); exposing his genitals to James Brent while sequestering James on his boat (A. 1287); and inviting Evan Stewart to engage in a mutual masturbation session (GX 407). In sum, the District Court was well within its discretion to admit other sexual-acts evidence under Rules 413 and 414.

Finally, even if the District Court erred in any of the evidentiary rulings challenged on appeal—and it did not—any error was harmless based on the overwhelming evidence of Paduch's guilt. Even setting aside the testimony of the four non-statutory victims, *seven* statutory victims testified against Paduch. And their testimony of his sexual assaults during medical exams was corroborative of one another and corroborated by documentary evidence revealing Paduch's sexual interest in young medical patients. (GX 608, 608M, 609, 609M, 610).

## POINT II

### Sufficient Evidence Supported the Jury's Verdict

Paduch argues that the trial evidence was insufficient to show that he knowingly induced the interstate travel of the six victims identified in Counts One, Two, Three, Four, Five, and Seven, as required under 18 U.S.C. § 2422(a). (Br. 21-23). Because Paduch did not raise this claim below, it is reviewed for plain error. And Paduch's argument fails under any standard

because ample evidence established that Paduch violated 18 U.S.C. § 2422(a) when he knowingly "persuade[d], induce[d], entice[d], or coerce[d]" the interstate travel of Sam Lenox, Luke Bevin, Evan Stewart, Connor Gannick, Matt Cirillo, and James Brent.

## A. Applicable Law

### 1. Standard of Review

"A defendant challenging the sufficiency of the evidence at trial bears a heavy burden, as the standard of review is exceedingly deferential." *United States v. Gahagen*, 44 F.4th 99, 108 (2d Cir. 2022). This Court must "view all of the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and . . . must affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt." *United States v. Josephberg*, 562 F.3d 478, 487 (2d Cir. 2009). In conducting its review, this Court "must analyze the evidence in conjunction, not in isolation, and apply the sufficiency test to the totality of the government's case and not to each element, as each fact may gain color from others." *United States v. Atilla*, 966 F.3d 118, 128 (2d Cir. 2020).

Although a sufficiency challenge is typically reviewed *de novo*, *United States v. Brock*, 789 F.3d 60, 63 (2d Cir. 2015), a challenge to sufficiency that is not preserved is reviewed for plain error only, *United States v. Allen*, 127 F.3d 260, 264 (2d Cir. 1997). "To preserve the sufficiency issue and avoid the burden of showing plain error, a defendant must have moved for

judgment of acquittal either at the close of all the evidence pursuant to Rule 29(a) or post-trial in a motion pursuant to Rule 29(c)." *Allen*, 127 F.3d at 264.

If a defendant's Rule 29 motion "stated a ground different from what he now urges on appeal," his claim is unpreserved and reviewed for plain error. *United States v. Delano*, 55 F.3d 720, 726 (2d Cir. 1995); *accord United States v. Dawkins*, 999 F.3d 767, 780 n.12 (2d Cir. 2021) (reviewing for plain error where "[a]lthough the defendants moved for judgments of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, they did not challenge the sufficiency of the evidence with respect to either of the[ ] points" raised on appeal); *United States v. Finley*, 245 F.3d 199, 202 (2d Cir. 2001) (where "defendant failed to renew his motion for acquittal on th[e] ground [pressed on appeal] at the close of the defense case," defendant "has the burden of persuading a court of appeals on the insufficiency issue that there has been plain error or manifest injustice"); *United States v. Gore*, 154 F.3d 34, 42 (2d Cir. 1998) (reviewing for plain error where defendant's Rule 29 motion failed to assert the issue raised on appeal).

"[R]eversal for plain error should 'be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" *United States v. Villafuerte*, 502 F.3d 204, 209 (2d Cir. 2007) (quoting *United States v. Frady*, 456 U.S. 152, 163 n.14 (1982)). To establish plain error, an appellant must show "that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in

the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010). "Meeting all four prongs is difficult, as it should be." *Puckett v. United States*, 556 U.S. 129, 135 (2009).

### 2. 18 U.S.C. § 2422(a)

Subsection (a) of 18 U.S.C. § 2422 provides in relevant part: "Whoever knowingly persuades, induces, entices, or coerces any individual to travel in interstate . . . commerce . . . to engage in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both." In instructing the jury on the first element of that statute —and without objection—Judge Abrams stated that the Government was required to prove "that the defendant knowingly persuaded, induced, enticed, or coerced, or attempted to persuade, induce, entice, or coerce, an individual to travel in interstate commerce." (A. 1904). The District Court went on to clarify—again without objection—that "the terms persuaded, induced, enticed, and coerced have their ordinary everyday meanings." (A. 1905).

## B. Discussion

Overwhelming evidence supported the jury's finding that Paduch persuaded, induced, enticed, or coerced Sam, Luke, Evan, Conor, Matt, and James to travel interstate so that he could sexually abuse them, in violation of 18 U.S.C. § 2422(a).

To begin, this Court should review Paduch's sufficiency claim for plain error. At the close of the Government's case, Paduch moved for a judgment of acquittal, claiming that the Double Jeopardy Clause required dismissal of the two counts on which the Government elected not to proceed at trial. (A. 1527). As to the remaining counts, Paduch moved to dismiss for lack of sufficient evidence, "particularly with the element of for his own sexual gratification." (*Id.*). Counsel then alleged a dearth of evidence "on that element." (*Id.*). Paduch proceeded to file a written motion under Rule 29, which omitted any claim of insufficient evidence and instead repeated his Double Jeopardy argument as to the two counts the Government did not present to the jury. (Dkt. 124).[11] Accordingly, although Paduch moved for a judgment of acquittal at the close of the Government's case, he did so on other grounds and failed to make the argument he now raises on appeal: that the Government failed to present sufficient evidence that he persuaded, induced, enticed, or coerced the victims. Because Paduch's argument below relied on "ground[s] different from what he now urges on appeal," this Court's review is for plain error. *Delano*, 55 F.3d at 726; *accord Dawkins*, 999 F.3d at 780 n.12.

Under any standard of review, Paduch's sufficiency claim fails. First, Paduch mischaracterizes the record

[11] On May 22, 2024, Paduch filed a supplemental motion under Rule 29 in which he again requested that the District Court enter a judgment of acquittal on the two counts that were not presented to the jury. (Dkt. 133).

by claiming that the Government relied solely on "inducement" to prove violations of § 2422(a) (Br. 21). In fact, the Government catalogued all the ways in which Paduch could have satisfied that element, *i.e.*, by persuading, inducing, enticing, or coercing his victims. (A. 1807). And Paduch is further incorrect that the "only instruction to the jury with respect to the inducement element of Section 2422 . . . was that the word 'induced has its ordinary meaning.' " (Br. 22). Judge Abrams instructed the jury on *all* the ways Paduch could have brought about the victims' interstate travel, noting that each of those terms, (*i.e.*, "persuaded, induced, enticed, and coerced") has its "ordinary everyday meaning[ ]." (A. 1905).

Even if Paduch were correct that the Government relied solely on proof of inducement, there was ample such evidence. The Government established that Sam, Luke, Evan, Connor, Matt, and James traveled from their homes outside New York to attend appointments *at Paduch's direction*. (*E.g.*, A. 541, 815, 1011, 1221, 1274-75, 1450-51; GX 401, 410). Further, the victims were clear that attending appointments with Paduch was their primary—and, usually, sole—reason for traveling interstate to New York City. (*E.g.*, A. 541, 816, 1027, 1218, 1275). Luke, for example, recounted driving from his home in Maryland to attend appointments with Paduch and driving home just as soon as those visits concluded. (A. 856). He also testified that Paduch determined his follow-up schedule, which Luke adhered to "[b]ecause [Paduch] was a doctor, so we just followed what he said." (A. 855-56). The other statutory victims recounted similar experiences following Paduch's treatment schedule. (A. 541-43, 1026-

27, 1218-19, 1221, 1274-75, 1450-51). Victims' parents said the same thing. Luke's mother, Krista, as well as Evan's mother, Beth, were clear that they accompanied their minor sons to appointments at Paduch's direction. (A. 815-16, 1007-08).

In addition to witness testimony, the Government introduced text messages between Paduch and victims further establishing Paduch's inducement of their interstate travel. In one message, for example, Paduch instructed Sam Lenox to schedule the "last appointment at 330." (GX 401). In another message to Sam, Paduch wrote, "I won't charge u since I don't take your insurance but best to see my [sic] in follow up." (*Id.*). Similarly, Paduch texted James Brent, "make sure that u make an appointment at certain point so I can see u in the office." (GX 410).

As further proof, the Government introduced medical records reflecting Paduch's instructions for the victims to schedule follow-up appointments. (*E.g.*, GX 205 at 48, 68, 399 (Luke); GX 212 at 266, 307, 495, 799 (Matt); GX 214 at 1534 (Connor)).

Without citation, Paduch insists that victims were referred to him due to his renown and were "independently motivated" to seek treatment. (Br. 21). But it is irrelevant how the victims came to find Paduch in the first instance, who "create[d] the motivation," or whether they wanted to be cured by him. (Br. 21). What matters is that Paduch induced the victims' interstate travel on the subsequent occasions during which Paduch sexually abused them. Whatever the victims' personal feelings toward treatment or reverence for Paduch, it both strains credulity and

contradicts the record to suggest that they would have traveled to Weill Cornell in Manhattan absent specific instruction from Paduch to attend follow-up appointments.[12]

## POINT III

## Section 2422 is Constitutional Under the Commerce Clause

Paduch next argues that 18 U.S.C. § 2422 exceeds Congress's power under the Commerce Clause. (Br. 24-29). That challenge is meritless, as the statute criminalizes interstate activity that the Supreme Court has long held to fall within Congress's regulatory authority.

### A. Relevant Facts

Prior to trial, Paduch never raised the argument that Section 2422 exceeds Congress's power under the Commerce Clause. (*See, e.g.*, Dkt. 45, 46 (pretrial

---

[12] To the extent Paduch argues that the victims attended appointments voluntarily (*see* Br. 23), that is also beside the point. The law does not require the Government to have proven that interstate travel was against a victim's will. *See United States v. Kelly*, 128 F.4th 387, 413 (2d Cir. 2025) (noting that § 2422(a) "imposes no requirement that an individual endeavor to transform or overcome the will of his intended victim," and citing *United States v. Waqar*, 997 F.3d 481, 487-88 (2d Cir. 2021) for the same proposition as to § 2422(b)).

motions failing to raise any Commerce Clause argument)).

On May 22, 2024, Paduch filed a motion for a new trial under Federal Rule of Criminal Procedure 33. (Dkt. 135). In this motion, Paduch argued—for the first time—that his convictions under Sections 2422(a) and (b) violated the Commerce Clause and the Due Process Clause because they were predicated on state offenses carrying maximum penalties shorter than the penalties he faced under federal law. (Dkt. 135). The Government responded the next day, noting that Paduch's motion sought dismissal of the Indictment, rather than a new trial, and that such relief was unavailable under Rule 33. (Dkt. 156). The Government further argued, on the merits, that Section 2422 is constitutional. (*Id.*).

In a written opinion, the District Court denied Paduch's motion for a new trial. (Dkt. 158). The District Court concluded that it "need not reach [the] question" of whether "a defendant can move to dismiss an indictment under Rule 33" because Paduch "neither explicitly asks [the District Court] to dismiss his indictment nor persuades it that § 2422 is unconstitutional." (Dkt. 158 at 5). Judge Abrams then explained her conclusions that Section 2422 does not violate the Commerce Clause or the Due Process Clause. (Dkt. 158 at 5-9).

## B. Applicable Law

### 1. Standard of Review

This Court typically reviews *de novo* a district court's determination of the constitutionality of a statute under the Commerce Clause. *See, e.g.*, *United States v. King*, 276 F.3d 109, 111 (2d Cir. 2002). But where the appellant failed to raise a timely challenge to the constitutionality of the statute below, this Court reviews the claim for plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Le*, 902 F.3d 104, 109 (2d Cir. 2018) (unpreserved claim that statute is unconstitutional is reviewed for plain error); *United States v. Santiago*, 238 F.3d 213, 215 (2d Cir. 2001) (applying plain error review to claim that criminal statute exceeded Congress's Commerce Clause authority).

Determining the constitutionality of a statute is "the gravest and most delicate duty" that a federal court can be called upon to perform, *Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (Holmes, J., concurring), since it must pass "on a considered decision of the Congress and the President," *Fullilove v. Klutznick*, 448 U.S. 448, 473 (1980). As such, it is axiomatic that each congressional act enjoys a presumption of constitutionality, and courts, "where possible, interpret[ ] congressional enactments so as to avoid raising serious constitutional questions." *Cheek v. United States*, 498 U.S. 192, 203 (1991); *see also Flemming v. Nestor*, 363 U.S. 603, 617 (1960) ("'It is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers,

and its acts to be considered as void."' (quoting *Fletcher v. Peck*, 10 U.S. 87, 128 (1810)).

A claim of facial unconstitutionality imposes a "heavy burden." *Sanitation & Recycling Industry, Inc. v. City of New York*, 107 F.3d 985, 992 (2d Cir. 1997) (citing *Younger v. Harris*, 401 U.S. 37, 52-53 (1971)). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). "The fact that the [relevant statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." *Id.*

### 2. The Commerce Clause

The Commerce Clause empowers Congress to "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. The Supreme Court has long interpreted that clause to grant Congress regulatory authority over "three broad categories of activity": (1) "the use of the channels of interstate commerce"; (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities"; and (3) "those activities having a substantial relation to interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558-59 (1995); *see also United States v. Morrison*, 529 U.S. 598, 609 (2000) (reciting three categories of regulation).

## C. Discussion

Paduch's Commerce Clause challenge fails under well-established Supreme Court and Circuit precedent.[13]

Counts One, Two, Three, Four, Five, and Seven of the Indictment charged Paduch with violations of

---

[13] Because Paduch's Commerce Clause challenge is entirely meritless, this Court need not decide whether it is subject to *de novo* or plain error review. If, however, the Court decides this question, it should apply the plain error standard. Under Federal Rule of Criminal Procedure 12(b)(3), Paduch was required to file any motion alleging constitutional defects in the Indictment before trial. Because Paduch failed to file such a motion and instead waited until a post-trial Rule 33 motion to raise his Commerce Clause challenge, this Court should review that argument for plain error. *See* Fed. R. Crim. P. 52(b); *Le*, 902 F.3d at 109. And because Paduch has failed to identify any binding precedent holding that Section 2422 is unconstitutional under the Commerce Clause, he cannot demonstrate that any purported error was plain. *United States v. Whab*, 355 F.3d 155, 158 (2d Cir. 2004) ("For an error to be plain, it must, at a minimum, be clear under current law. We typically will not find such error . . . where there is no binding precedent from the Supreme Court or this Court."); *see also United States v. Napout*, 963 F.3d 163, 183 (2d Cir. 2020); *United States v. Bastian*, 770 F.3d 212, 220 (2d Cir. 2014); *United States v. Weintraub*, 273 F.3d 139, 152 (2d Cir. 2001).

Section 2422(a), which outlaws the inducement or attempted inducement of an individual to "*travel in interstate* . . . *commerce* . . . to engage in . . . any sexual activity for which any person can be charged with a criminal offense." 18 U.S.C. § 2422(a) (emphasis added). That subsection expressly references the transit of persons in interstate commerce, a category of activity the Supreme Court has found to fall squarely within the ambit of the Commerce Clause. *Lopez*, 514 U.S. at 558-59; *Morrison*, 529 U.S. at 609. Moreover, as this Court has recognized, "[i]nterstate travel inherently involves use of the channels of interstate commerce." *United States v. Guzman*, 591 F.3d 83, 90 (2d Cir. 2010), *as amended* (Jan. 8, 2010).

Counts Eight, Nine, Ten, Twelve, and Thirteen of the Indictment charged Paduch with violations of Section 2422(b), which outlaws the use of "*the mail or any facility or means of interstate* . . . *commerce*" to induce or attempt to induce a minor to engage in unlawful sexual activity. 18 U.S.C. § 2422(b) (emphasis added). This activity—using quintessential instrumentalities of interstate commerce—likewise falls within the second category of activity that Congress may regulate under the Commerce Clause. *See Lopez*, 514 U.S. at 558-59; *Morrison*, 529 U.S. at 609; *see also United States v. Giordano,* 442 F.3d 30, 41 (2d Cir. 2006) (rejecting Commerce Clause challenge to statute outlawing "use of the mail or any facility or means of interstate . . . commerce to specified ends," because such a law is "clearly founded on the second type of Commerce Clause power").

In keeping with *Lopez* and *Morrison*, federal courts have repeatedly upheld the constitutionality of § 2422 and similarly worded statutes. *See, e.g.*, *Giordano,* 442 F.3d at 41 (upholding constitutionality of § 2425, which prohibits interstate transmission of information about a minor); *United States v. Griffith*, 284 F.3d 338, 348 (2d Cir. 2002) (holding that § 2251(a) is constitutional because "the movement of the visual depiction itself in interstate commerce represents a constitutional exercise of Congress' authority under the Commerce Clause"); *United States v. Hornaday*, 392 F.3d 1306, 1310 (11th Cir. 2004) ("Hornaday's related contention that if § 2422(b) covers his actions its enactment exceeded Congress' Commerce Power is meritless."); *United States v. Tykarsky*, 446 F.3d 458, 470 (3d Cir. 2006) ("Accordingly, both § 2423(b) and § 2422(b) represent constitutional exercises of Congress's Commerce Clause power to regulate the use of the channels and instrumentalities of interstate commerce.").

Consistent with this well-established precedent, Paduch's Commerce Clause argument fails. To the extent he raises a facial challenge to Section 2422, he cannot establish, as he must, "that no set of circumstances exist under which the Act would be valid." *Salerno*, 481 U.S. at 745. And to the extent he raises an as-applied challenge, that challenge fails because—as the jury found—Paduch induced his victims to "travel in interstate . . . commerce . . . to engage in" sexual activity, and used "the mail or any facility or means of interstate . . . commerce" to induce minors to engage in sexual activity. 18 U.S.C. §§ 2422(a), (b). Paduch's

conduct thus fell well within the category of activity that Congress may regulate under the Commerce Clause.

Paduch concedes that Section 2422 outlaws "interstate travel, and using instrumentalities of interstate commerce" (Br. 25)—*i.e.*, conduct contemplated by at least the second category described in *Lopez*. Nevertheless, he insists that the statute is unconstitutional, as applied to him, because his conduct was non-commercial. (Br. 26). But conduct must fall under only *one* of the categories outlined in *Lopez* to pass constitutional muster. In other words, "a showing that a regulated activity substantially affects interstate commerce is unnecessary when Congress regulates activity involving an instrumentality or facility of interstate commerce." *United States v. McGriff*, 287 F. App'x 916, 918 (2d Cir. 2008); *see also United States v. Gil*, 297 F.3d 93, 100 (2d Cir. 2002). Paduch's reliance on out-of-circuit cases assessing the constitutionality of laws within the third category of *Lopez*—or altogether outside the *Lopez* framework—are thus beside the point. (*See* Br. 26-27 (citing *United States v. Whited*, 311 F.3d 259, 267 (3d Cir. 2002) ("Like the statutes considered in *Lopez* and *Morrison*, 18 U.S.C. § 669 is properly analyzed as an attempt by Congress to regulate within the third category of its powers as enumerated by the Court."); *United States v. Nicholson*, 185 F. Supp. 2d 982, 989 (E.D. Wis. 2002) (concluding that both 18 U.S.C. § 241 and 42 U.S.C. § 3631 regulate activity that sufficiently affects interstate commerce); *United States v. Patton*, 451 F.3d 615, 620 (10th Cir. 2006) (upholding constitutionality of statute outlawing possession of body armor notwithstanding

that the law did not fit into any of the *Lopez* categories)).

Moreover, there was ample evidence that Paduch's conduct had "a substantial relation to interstate commerce." *Lopez*, 514 U.S. at 558. In addition to inducing his victims to travel across state lines, Paduch used his affiliation with Weill Cornell—a massive hospital system undoubtedly engaged in interstate commerce—to attract his victims and carry out his scheme. (*E.g.*, A. 569, 804). Paduch also used cellphones to communicate with his victims across state lines. (*E.g.*, GX 401, 407, 410, 414). And Paduch himself traveled to other states to recruit additional victims, from whom he derived both sexual gratification and economic gain (through payments for his treatment). (A. 796 (Luke's mother, Krista Bevin, explaining that she met Paduch at a medical conference in Baltimore, at which Paduch told her that he treated patients from all over the country)).

Paduch also cites *Jones v. United States*, 529 U.S. 848 (2000) (*see* Br. 27-28), but that case is inapposite. *Jones* involved an as-applied challenge to the federal arson statute, which criminalizes damaging or destroying, "by means of fire or an explosive, any . . . property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." 18 U.S.C. § 844(i). The question presented was whether to construe § 844(i) to include an owner-occupied private residence that had been used solely for non-commercial purposes. 529 U.S. at 850. To avoid a constitutional question, the Supreme Court held that such a residence was not "used in . . . any activity

affecting . . . commerce" within the meaning of § 844(i). *Id.* at 850-51. Unlike in *Jones*, this case does not concern the canon of constitutional avoidance. There is no plausible argument that Paduch's conduct—including his inducement of victims' interstate travel and his use of other instrumentalities of interstate commerce—did not fall "within [§ 2422's] compass." *Id.* at 850. Rather, he argues that Congress should not be permitted to criminalize such conduct under the Commerce Clause. *Lopez*, *Morrison*, and the cases catalogued above say otherwise.

## POINT IV

## Paduch's Life Sentence for His Repeated Sexual Abuse of Numerous Minors Does Not Violate the Eighth Amendment

For the first time on appeal, Paduch argues that his life sentence constituted "cruel and unusual punishment" in violation of the Eighth Amendment. (Br. 30-33). But the District Court did not err—much less plainly err—in imposing a life sentence based on Paduch's yearslong scheme to repeatedly use his position of authority to sexually abuse children, including children with pervasive cognitive impairments, who had been entrusted to his medical care.

### A. Relevant Facts

In advance of sentencing, the Probation Office prepared the Presentence Report. Based on a total offense level of 43 and a criminal history category of I, the Presentence Report calculated a Guidelines range of life imprisonment. (PSR ¶183).

In his objections to the Presentence Report and his sentencing submission to the District Court, Paduch disputed several enhancements that the Probation Office applied in calculating the Guidelines range. (PSR pp. 37-47; Dkt. 175 at 12-16). According to Paduch, the correct offense level was 36, resulting in a Guidelines range of 188 to 235 months' imprisonment. (Dkt. 175 at 16). Neither in his objections to the Presentence Report nor in his sentencing memorandum did Paduch argue that a sentence of life imprisonment would violate the Eighth Amendment or otherwise be unconstitutional.

At sentencing, Judge Abrams calculated the appropriate Guidelines range, overruling all of Paduch's objections to the Guidelines enhancements applied in the Presentence Report. (A. 1972-77). Judge Abrams also applied an additional two-level enhancement based on a finding that Paduch had abused vulnerable victims —namely, Luke Bevin and Evan Stewart—both of whom suffered cognitive and expressive delays associated with their Klinefelter Syndrome. (A. 1974-76). Consistent with the Presentence Report, the District Court calculated an offense level of 43 and a Guidelines range of life imprisonment. (A. 1977).[14]

[14] The additional two-point enhancement applied by the District Court resulted in a total offense level of 47, two levels above the offense level of 45 calculated by the Probation Office. (PSR ¶ 132). Because the highest offense level in the Guidelines is 43, however, the District Court and the Probation Office were aligned in the final offense level under the Guidelines. *See* U.S.

Judge Abrams then permitted victims to speak.[15] Krista Bevin, Luke's mother, testified that Paduch's crimes against her son's "young body" would forever haunt her. (A. 2001). Luke was Krista's "beautiful, sweet, innocent boy." (A. 2006). He was a "child throughout the abuse," unable to "make informed decisions in an exam room regarding the method his doctor was using to treat his condition." (A. 2001). Krista "beg[ged]" the District Court "on behalf of all the victims"—"who are also serving their own personal life sentences"—"their families, and loved ones" to sentence Paduch "to the maximum penalty allowed by law," namely, "imprisonment for life." (A. 2006). Paduch also addressed the court, asking for mercy on him and his family. (A. 2028). He offered no apology for his crimes nor recognition of his wrongdoing. (*See* A. 2028-29).

Before pronouncing Paduch's sentence and its justification, Judge Abrams asked the parties whether there was any legal reason why sentence could not be imposed. (A. 2029). Neither then nor at any other point in the proceeding did Paduch raise a constitutional claim against a life sentence.

---

Sentencing Guidelines, Ch. 5, Pt A (comment n.2). (PSR ¶ 134).

[15] While Judge Abrams permitted a non-testifying victim to be heard at sentencing and dozens more to submit letters in connection with the proceeding, only the accounts of testifying victims factored into the District Court's sentence. (A. 1982).

Ultimately, the District Court imposed a sentence of 240 months' imprisonment on Counts One through Five and Seven, which charged inducement to travel to engage in unlawful sexual activity, in violation of 18 U.S.C. § 2422(a). The District Court imposed life sentences on Counts Eight, Nine, Ten, Twelve, and Thirteen, which charged inducement of a minor to engage in unlawful sexual activity, in violation of 18 U.S.C. § 2422(b). (A. 2035).

Judge Abrams offered detailed reasons for the sentence she imposed. (A. 2030-35). As she explained, Paduch's victims were "so much more vulnerable than most"—they were medical patients who sought out Paduch's expertise for the "most sensitive of issues" and who were reassured by the prestige of his credentials and professional affiliation. (A. 2031-32). In return, Paduch systematically and deceptively "robbed boys of their innocence." (A. 2032). These children were desperate for Paduch's help and, in some cases, cognitively challenged. (A. 2031-32). Accordingly, Judge Abrams noted, Paduch had committed the "worst breach of trust imaginable." (A. 2032). Judge Abrams also focused on the lasting trauma of Paduch's abuse, explaining that she had rarely, if ever, seen the level of emotional harm that Paduch inflicted in another case. (A. 2030). The District Court went on to catalog the mental health issues that "infuse and often destroy [the victims'] lives every day." (A. 2033). Paduch's yearslong abuse of these young patients was, in a word, "unspeakable." (A. 2033).

## B. Applicable Law

### 1. The Eighth Amendment and Proportionality

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. This prohibition "contains a narrow proportionality principle that applies to noncapital cases." *Ewing v. California*, 538 U.S. 11, 20 (2003) (plurality opinion). The narrow principle, however, "does not require strict proportionality between crime and sentence"; rather, "it forbids only extreme sentences that are grossly disproportionate to the crime." *Id.* at 23.

The Supreme Court and this Circuit have cautioned that "successful challenges to the proportionality of particular sentences should be exceedingly rare." *Ewing*, 538 U.S. at 22; *accord Hutto v. Davis*, 454 U.S. 370, 374 (1982); *United States v. Yousef*, 327 F.3d 56, 163 (2d Cir. 2003). "Lengthy prison sentences, even those that exceed any conceivable life expectancy of a convicted defendant, do not violate the Eighth Amendment's prohibition against cruel and unusual punishment when based on a proper application of the Sentencing Guidelines or statutorily mandated consecutive terms." *Yousef*, 327 F.3d at 163.

The Supreme Court has outlined a two-step analysis to assess a proportionality claim. First, a reviewing court "compar[es] the gravity of the offense and the severity of the sentence." *United States v. Reingold*, 731 F.3d 204, 211 (2d Cir. 2013) (quoting *Graham v. Florida*, 560 U.S. 48, 60 (2010)). If no inference of gross

disproportionality arises from that comparison, the court's inquiry ends. Only in "the rare case in which this threshold comparison . . . leads to an inference of gross disproportionality" does a court proceed to the second step, which "compare[s] the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions." *Graham* 560 U.S. at 60.

### 2. Standard of Review

Where the issue of Eighth Amendment proportionality is not properly raised with the district court, this Court reviews for plain error. *United States v. Carter*, 110 F. App'x 165, 166 (2d Cir. 2004); *United States v. Rivera*, 546 F.3d 245, 254 (2d Cir. 2008) (appellant forfeited Eighth Amendment challenge to a sentence after failing to raise challenge before the district court); *see also United States v. Diaz,* 176 F.3d 52, 117 (2d Cir. 1999).

## C. Discussion

Because Paduch never raised an Eighth Amendment argument below, his claim is reviewed for plain error. *Carter*, 110 F. App'x at 166; *Rivera*, 546 F.3d at 254; *Diaz,* 176 F.3d at 117. And it fails under any standard because a life sentence is not disproportionate—much less grossly disproportionate—for Paduch's yearslong scheme to entice and sexually abuse children entrusted to his medical care.

As a threshold matter, Paduch's Eighth Amendment claim fails because, as he does not dispute (*see*

Br. 30-33), his sentence was "based on a proper application of the Sentencing Guidelines." *Yousef*, 327 F.3d at 163 (explaining that "[l]engthy prison sentences . . . do not violate the Eighth Amendment's prohibition against cruel and unusual punishment when based on a proper application of the Sentencing Guidelines"). The Sentencing Guidelines called for a sentence of life imprisonment, and that is the sentence Paduch received.

Furthermore, Paduch's claim rests on a fundamentally incorrect premise—that the imposition of a life sentence reflected "incidental" interstate travel. (Br. 32). Judge Abrams did *not* impose a life sentence on the counts connected to the victims' interstate travel as charged in Counts One through Five and Seven. Rather, she imposed a life sentence on Counts Eight, Nine, Ten, Twelve, and Thirteen, which charged Paduch with inducing and enticing minors to engage in unlawful sexual activity. 18 U.S.C. § 2422(b).

Even if this Court were to engage in a proportionality analysis, it need not proceed past the first step. Recognizing the gravity of sex crimes against children, this Court has summarily rejected Eighth Amendment challenges to life sentences imposed for violations of federal child pornography laws. *See, e.g.*, *Rivera*, 546 F.3d at 255 (no inference of gross disproportionality where defendant was sentenced to 480 months' imprisonment for violations of § 2422(b) and life imprisonment for child pornography); *United States v. Puglisi*, 458 F. App'x 31, 35 (2d Cir. 2012). Where children are not merely depicted, but are enticed for the purpose of engaging in actual sexual activity, the gravity of the

crime is at least as great, and the severity of the punishment at least as warranted.[16] Indeed, Congress deemed violations of § 2422(b) so dangerous to children that it saw fit to impose a ten-year mandatory minimum, even "in cases where there is no actual child victim," *United States v. Nagel*, 559 F.3d 756, 761 (7th Cir. 2009), and to authorize up to life imprisonment. *See also United States v. Dwinells*, 508 F.3d 63, 69 (1st Cir. 2007) (explaining that the three consecutive increases in the maximum possible sentence for violations of § 2422(b) "suggests a crystallizing vision on Congress's part of the need for stern punishment in this milieu").

Paduch's crimes reflected particularly heinous violations of § 2422(b). He successfully enticed "actual child victim[s]," *Nagel* 559 F.3d at 761, who were his medical patients. They trusted him implicitly and, in some cases, lacked the cognitive tools to register, much less reject, his abuse. (A. 2031). The harm Paduch inflicted on them was neither speculative nor short-lived. It was, as Judge Abrams noted, "visceral." (A. 2031). Sam Lenox wept throughout his testimony and shook visibly, requiring the assistance of a sensory tool (a rubber band) to calm him on the stand. (Dkt.

---

[16] Certainly, such conduct is worse than "obtaining $120.75 by false pretenses," for which a defendant was charged with felony theft and sentenced to life imprisonment. *Rummel v. Estelle*, 445 U.S. 263, 285 (1980). In *Rummel*, the Supreme Court held that such a sentence did not violate the Eighth Amendment's proportionality principle. *Id.*

178 at 35; A. 2031). Toran Chambers suffered an anxiety attack during his trial testimony. (Dkt. 178 at 37; A. 2031).

In advance of sentencing, Matthew Colon recounted the "profound emotional and psychological effects" he continues to suffer after Paduch abused him at just 13 years old. (Dkt. 178 at Ex. A-7). For Matthew, "holding Darius Paduch accountable to the full extent of the law" was important not only for his healing, but also for protecting others from Paduch's predations. (*Id.*). Evan Stewart, a victim with Klinefelter Syndrome, wrote that he suffered daily flashbacks of what Paduch had done to him, when he was "only a 15 year old boy." (Dkt. 178 at Ex. A-44). Evan sought justice for "a bad man going to prison for a very long time." (*Id.*). Luke Bevin, whose abuse also began when he was a young teenager seeking treatment for Klinefelter Syndrome, wrote in searing detail how Paduch's abuse had derailed his life. (Dkt. 178 at Ex. A-5). The knowledge of Paduch's crimes against her son stabs Krista Bevin "with a million knives every day." (A. 2002). She bears indelible wounds "that only a mother who loves her child can know." (*Id.*).

A life sentence for such odious conduct does not give rise to an inference of gross disproportionality. Certainly, such an inference would not have been "clear or obvious." *Marcus*, 560 U.S. at 262. And because Paduch has not identified any binding precedent finding that an Eighth Amendment violation occurred under these (or remotely similar) circumstances, he cannot satisfy the plain error standard. *Whab*, 355 F.3d at 158 ("For an error to be plain, it must, at a minimum,

be clear under current law"); *Napout*, 963 F.3d at 183; *Bastian*, 770 F.3d at 220; *Weintraub*, 273 F.3d at 152.

The thrust of Paduch's proportionality argument rests on the discrepancy between (1) the maximum sentence for the underlying sexual activity proscribed by New York law, and (2) the maximum sentence for the federal laws he violated. Paduch insists that a life sentence under federal law is grossly disproportionate where the maximum state sentence for the predicate sexual activity was far lower. (Br. 30-33). He is incorrect. To begin, the underlying New York crime does not account for the minor status of a victim, as the federal law does. *See* N.Y.P.L. § 130.55. And there is no question that sex crimes against children are graver than sex crimes against most other victim populations. Nor does the state law account for the use of interstate communications to entice victims. Where, as here, a defendant's acts "impinge more seriously on a federal interest than on a state interest," sentencing disparities "will very often arise." *Abbate v. United States*, 359 U.S. 187, 195 (1959). In fact, as Judge Abrams noted in rejecting Paduch's Due Process challenge to the sentencing disparity, a district court need not even consider incongruities between sentences for similar federal and state offenses. (Dkt. 158 (citing *United States v. Johnson*, 505 F.3d 120, 123-24 (2d Cir. 2007)). Whether brought under the Eighth Amendment or the Due Process Clause, Paduch's proportionality claim fails at the first step.

Even if this Court were to deem this the "rare case in which this threshold comparison . . . leads to an inference of gross disproportionality" and proceed to the

second step of the proportionality inquiry, Paduch's Eighth Amendment claim fails. *Graham* 560 U.S. at 60. Offenders in this jurisdiction have received life sentences for similar conduct. In *United States v. Vickers*, for example, this Court affirmed a life sentence for a defendant who was convicted of two counts of violating 18 U.S.C. § 2423, which makes it a crime to transport a minor in interstate commerce for the purpose of engaging in criminal sexual activity. 708 F. App'x 732, 738 (2d Cir. 2017). In upholding the substantive reasonableness of the sentence, this Court emphasized aggravating factors that apply equally to Paduch, including a decades-long history of repeatedly abusing young boys, as well as the impact such conduct had on the victims. *Id.*

Other jurisdictions have also imposed life sentences on offenders similarly situated to Paduch. In *United States v. Worsham*, for example, the Eleventh Circuit—applying plain-error review—rejected an Eighth Amendment proportionality challenge to a life sentence imposed for a single count of conviction under § 2422(b). 479 F. App'x 200, 206 (11th Cir. 2012); *see also United States v. Hooper*, No. 21-4220, 2022 WL 1184181, at *6 (4th Cir. Apr. 21, 2022) (rejecting Eighth Amendment proportionality challenge to life sentence imposed for two counts of § 2422(b)); *United States v. Frederick*, No. 22-50256, 2024 WL 3886979, at *2 (9th Cir. Aug. 21, 2024) (upholding substantive reasonableness of life sentence imposed on one count of § 2422(b), as well as one child-pornography count); *United States v. Butler*, 39 F.4th 1349, 1351 (11th Cir. 2022) (upholding substantive reasonableness of life sentence imposed on § 2422(b) count).

By contrast, where sentences for violations of § 2422 have fallen short of life in prison, the conduct was less egregious than Paduch's. In *United States v. McGrain*, for example, this Court upheld a 22-year sentence involving the enticement of a single minor over the course of about a year and a half. 105 F.4th 37, 39-46 (2d Cir. 2024); *see also United States v. Kohlmeier*, 858 F. App'x 444, 445 (2d Cir. 2021) (affirming 25-year sentence for single count of enticement to which defendant pled guilty); *Brown v. United States*, No. 19-2828, 2020 WL 1061074, at *1 (2d Cir. Feb. 12, 2020) (denying certificate of appealability to defendant challenging 292-month sentence following guilty plea to one count of child enticement).[17] A life sentence was

[17] Paduch points to *United States v. Ramos*, 23 Cr. 380 (JGK) and *United States v. Concepcion*, 21 Cr. 479 (LAP) as cases in which defendants received "far less severe sentences." (Br. 33). But those cases are readily distinguishable. In *Ramos*, the defendant was not charged with or convicted of violating § 2422(b); indeed, none of the charged conduct involved minors. (*See* 23 Cr. 380 (JGK), Dkt. 2, 14, 24). While the defendant in *Concepcion* was convicted of violating § 2422(b), he victimized fewer children, for a shorter time, than did Paduch. (*See* 21 Cr. 479 (LAP), Dkt. 74) (charging conduct spanning 2000 to 2007 and involving five victims)). Further distinguishing and exacerbating Paduch's crimes were the cognitive and expressive delays facing his child-victims, as well as the deception involved in masking sexual abuse as medical care. Finally, in both *Ramos* and *Concepcion*, the defendants pled guilty (in Ramos' case to a superseding

proportionate to the "unspeakable" harm that Paduch inflicted. (A. 2033).

## CONCLUSION

**The judgment of conviction should be affirmed.**

Dated: New York, New York
March 19, 2026

Respectfully submitted,

JAY CLAYTON,
*United States Attorney for the Southern District of New York, Attorney for the United States of America.*

MARGUERITE B. COLSON,
ELIZABETH A. ESPINOSA,
NI QIAN,
JUN XIANG,
JAMES LIGTENBERG,
*Assistant United States Attorneys, Of Counsel.*

information), thereby accepting responsibility for their crimes and sparing victims the ordeal of testifying. (*See Ramos*, 23 Cr. 380 (JGK), Dkt. 29 at 4; *Concepcion*, 21 Cr. 479 (LAP), Dkt. 112)).

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 13,405 words in this brief.

JAY CLAYTON,
*United States Attorney for the Southern District of New York*

By: JAMES LIGTENBERG,
*Assistant United States Attorney*